IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

Eboni Lyles                           PLAINTIFF

v.                                   No. 3:16cv154TSL-RHW

QCHC Inc. d/b/a Quality Correctional            DEFENDANTS
Health Care
&amp;                                  (JURY TRIAL DEMANDED)
Kimyuana Jackson

## COMPLAINT

COMES NOW THE PLAINTIFF and alleges as follows:

### PARTIES

1. Plaintiff Eboni Lyles is an adult resident of Jackson, Mississippi and a former employee of the Defendants.

2. Defendant QCHC Inc. d/b/a Quality Correctional Health Care is a foreign corporation. It has a principal place of business in the United States in Birmingham, Alabama, is incorporated under the laws of Alabama. Among other things, it is a government contractor providing health care services to the incarcerated. It has a location operating in the Madison County Jail at 2935 U.S. Highway 51, Canton, Mississippi 39046. It can be served at its registered agent Incorp Servs., Inc., 302 Enterprise Dr., Suite A, Oxford, MS 38655.

3. Defendant Kimyuana Jackson is the manager responsible for QCHC's operations at the Madison County Jail.

4. The acts and omissions alleged herein were performed by and attributable to the Defendants through their agents and employees. Said acts and omissions were within the scope of agency/employment, and Defendants participated in, approved and/or ratified the acts and omissions of others complained of herein.

## JURISDICTION & VENUE

5. Jurisdiction is proper in this court under 28 U.S.C. § 1331 because this claim arises under Section 16(b) of the Fair Labor Standards Act, 29 U.S.C. §§ 216(b).

6. Venue is proper in this court under 42 U.S.C. § 2000e-5(f)(3) because this is the judicial district in which Ms. Lyles worked for QCHC and Ms. Jackson.

## FLSA COVERAGE, STATUTE OF LIMITATIONS, JURY TRIAL

7. Defendant QCHC has more than $500,000 in gross volume under Section 3(s)(1)(A) of the FLSA.

8. Alternatively, Defendant QCHC is a health care institution covered by Section 3(s)(1)(B) of the FLSA.

9. Alternatively, Defendant QCHC is, by contract, an activity of a public agency covered by Section 3(s)(1)(C) of the FLSA.

10. Defendant QCHC is a "person" and "employer" as defined by Section 3(a) & (d) of the FLSA.

11. Defendant QCHC is covered by the FLSA.

12. Defendant Kimyuana Jackson is a "person" as defined in Section 3(a) of the FLSA, and was acting in the interest of QCHC in relation to Plaintiff in this case. She is therefore also an employer under Section 3(d) in commerce under Section 3(s), and subject to the provisions of the FLSA.

13. Plaintiff Eboni Lyles is an employee as defined in Section 3(e) of the FLSA, and is not exempt by any law or regulation. She is therefore protected by the FLSA.

14. All events recounted herein occurred within the last two years, and are therefore within the applicable statute of limitations under 29 U.S.C. § 255.

15. Plaintiff hereby demands trial by jury on all issues so triable.

## FACTS

### Defendant Jackson illegally alters QCHC time and attendance records.

16. Ms. Lyles began employment with QCHC on an *ad hoc* basis in late 2014, and became a full-time employee on or about June 2015.

17. Ms. Lyles worked as a nurse (an LPN) at two QCHC locations, the Rankin County Jail and the Madison County Jail.

18. Under well-established FLSA guidance, LPNs including Ms. Lyles are covered by the minimum wage and overtime provisions of the FLSA.

19. LPNs worked in two shifts, a day shift and a night shift. At the Madison County Jail, Ms. Lyles worked the night shift on Monday and Friday, and the day shift on

Wednesday. At the Rankin County Jail, Ms. Lyles worked every other Sunday.

20. It was common for employees to need extra time to finish work, and many employees work extra hours when necessary. In addition, at shift change, the night and day shift LPNs discuss outgoing reports regarding the facility medical issues that arose during the shift. By necessity, this requires employees to continue working past the scheduled shift time on a regular basis.

21. Until November 13, 2015, Ms. Lyles had never called in sick. She volunteered for extra shifts when a fill-in was needed, and worked regular overtime.

22. Time is kept using a clock-in system. There is a computer terminal in the nursing station, behind security. To clock in or out, nurses type an employee ID number and the last four digits of their social security number. The system then prompts for which location the nurse is working, and the nurse would select as appropriate. Then the system would show the exact time of clock in and the nurse would be prompted to click "OK." There is also a mechanism by which employees can leave comments on time record entries, either when the entry is made or at some time thereafter.

23. Because the time is noted down at the moment the record is entered, an entry can only be made if the employee is physically standing at the terminal at the back of the jail.

24. Managers have authority to alter the time records in the system, even without

the relevant employees' login information or permission. Once altered, the system leaves no discernible trace in the employee's interface. For this reason, unless the employee keeps independent records, the manager may be able to alter employee time records without the employee ever learning of it.

25. On information and belief, Defendant Jackson altered the time records of her employees, including Ms. Lyles, on numerous occasions.

26. On one such occasion, Ms. Jackson spread time worked on one day over two separate weeks. This impacted the overtime calculations and delayed a portion of the wages owed into a different pay period, resulting in underpayment and/or improperly delayed payment.

27. In addition, on November 11, 2015, Ms. Lyles noticed that Ms. Jackson had altered her recorded time for November 7th and November 9th to delete some of the hours that she had worked. She changed the clock in time for November 7 from 8:25 A.M. to 8:50 A.M., and the clock out time for November 9 from 9:10 A.M. to 7:30 A.M.

**Ms. Lyles files complaints with Ms. Jackson and with Corporate HR.**

28. Ms. Lyles went to the clock-in console at the facility and entered notes into the system stating that those times had been altered and were not correct.

29. Ms. Lyles also complained directly to Ms. Jackson.

30. She informed Ms. Jackson that it was illegal to alter time records or to not pay

her for time she worked.

31. Ms. Jackson responded that "Corporate said this is how it is going to be from now on."

32. Ms. Lyles also called and complained to Zack Hintz, the head of human resources at the corporate headquarters for QCHC.

33. Ms. Lyles also discussed the matter with many of her co-workers.

34. In the meantime, Ms. Jackson had issued a memorandum stating, among other things, the following: "Please note that if you remain on the clock beyond 7:30 am/pm without approval, your time will be **ADJUSTED**." (emphasis in original).

35. The memo was on official company letterhead, from Ms. Jackson to "Nursing Staff," and was also countersigned by other managers/supervisors.

**Ms. Lyles is banned from the facility.**

36. On November 13, 2015, at the security shift-change meeting routinely held at 2:45 pm, Ms. Jackson informed the security staff at the Madison County Jail that Ms. Lyles was no longer allowed past security at the facility.

37. Ms. Jackson did not inform Ms. Lyles that she was no longer permitted past security.

**Ms. Lyles calls in sick – with a doctor's excuse.**

38. In the meantime, Ms. Lyles was feeling ill and went to University Physicians – Flowood Family Medicine Center and obtained an excuse from work.

39. At 3 pm, on November 13, Ms. Lyles called Ms. Jackson to let her know that she was sick would not be reporting to work that night at 7pm.

40. Ms. Jackson explicitly agreed to give Ms. Lyles the night off. Ms. Jackson said that she had thought Ms. Lyles would not be coming to work that night, and that she already had the shift covered by someone else.

41. Immediately thereafter, at 3:07 pm, Ms. Lyles called Ashlei Porter – Chief Nursing Officer at QCHC corporate headquarters – and repeated her complaints about Ms. Jackson changing time sheets. She also complained that Ms. Jackson's expectations that night shift workers would clock out at 7:30 am were unrealistic, because night shift was more onerous than day shift and there was often last-minute work in the morning that needed to be completed.

42. Ms. Lyles also told Ms. Porter that she was sick that day. She told Ms. Porter that she was concerned that Ms. Jackson might retaliate against her for going to corporate on the time record issue.

43. Later that afternoon, Ms. Lyles had a voicemail from Ms. Jackson telling her to report to work to meet with Ms. Jackson at some time between 9 am and 5 pm. Because this is her typical night-shift day, Ms. Lyles thought she was going to be fired.

44. Ms. Lyles also got calls from others working at the Madison jail, saying that Ms. Jackson had said Ms. Lyles would no longer be allowed past security. These

others reported that the reason was that Ms. Lyles had complained of wage and hour violations.

45. Later that night, Ms. Lyles began to feel better, and at about midnight, decided to go to a concert.

46. On November 14, Ms. Lyles called Ms. Mangum – the manager at the Rankin County facility – and asked if she still had a job. Ms. Mangum said yes, and told her to report as scheduled on November 15 for her Sunday shift.

47. On November 15, Ms. Lyles worked a full day in the Rankin County facility.

**Ms. Lyles is fired for a pretextual reason – allegedly playing sick.**

48. On November 16, 2015, Ms. Lyles reported to the Madison facility during the day as requested.

49. When she arrived, she was escorted by Ms. Jackson past security. Ms. Jackson then informed Ms. Lyles that she was fired.

50. Ms. Jackson said that the reason she was fired was that she "premeditated" to call in sick when she was not in fact sick.

51. According to Ms. Jackson, it did not matter that Ms. Lyles had a doctor's excuse; it did not matter that Ms. Lyles was given permission to miss that shift; it did not matter that a replacement was already arranged for that shift. Ms. Jackson said that she knew Ms. Lyles was going to call in sick in advance. Ms. Jackson offered no explanation for her decision not to discuss the issue with Ms. Lyles when she

called in sick. Ms. Jackson offered no explanation for the fact that she had banned Ms. Lyles from the facility even before she called in sick.

52. On November 18, 2015, Ms. Lyles texted Ms. Mangum to ask if she needed Ms. Lyles to come in that Saturday. Ms. Magnum responded that HR had told her she could not use Ms. Lyles anymore.

**QCHC later identifies new pretextual reasons for disciplining Ms. Lyles**

53. In correspondence dated January 21, 2016, QCHC admits that Ms. Lyles was banned from the facility on Friday November, 13, 2015, before she allegedly misrepresented her illness.

54. However, QCHC for the first time identifies a new reason for this discipline. It claims that Ms. Jackson first learned on November 13 that Ms. Lyles had outstanding traffic tickets resulting in a suspended drivers license and warrant. QCHC claimed that these traffic tickets "reflected a lack of respect for the rule of law," and that it was for this reason she was not permitted in the jail.

55. QCHC misstates the facts. Ms. Lyles had already told Ms. Jackson about her license and traffic tickets months before – even before she started full time work.

56. This is why Ms. Jackson did not raise the issue in her conversation with Ms. Lyles on Monday – the traffic tickets had nothing to do with it, and Ms. Jackson knew that Ms. Lyles would immediately see through it.

57. Ms. Lyles had also already told the head of the Madison County Jail about the

issue, and he had not thought it presented any problem at that time. Ms. Lyles asked him to help her get more time to pay a traffic ticket, and he had obliged. In addition, Ms. Lyles has since worked out an arrangement for the payment of all her outstanding tickets.

58. QCHC cannot explain how the alleged security risk did not apply to Rankin County, where Ms. Lyles was permitted to work on Sunday November 15, 2015.

59. QCHC cannot explain how an employee who has been banned from work can have done anything wrong by missing her shift – whether sick or not.

## CAUSES OF ACTION

### COUNT 1: Failure to pay/timely pay mandated overtime

60. The Plaintiff incorporates all allegations set forth in all other sections of this complaint.

61. Plaintiff is an employee covered by the minimum wage and overtime provisions of the FLSA.

62. Defendants falsified Plaintiff's time records by deleting hours worked on certain days and/or moving those hours to another work week.

63. This violates the relevant FLSA provisions and regulations.

64. Defendants' violation was willful.

65. For these reasons, Plaintiff is entitled to the remedies described below.

## COUNT 2: Falsifying and threatening to falsify records

66. The Plaintiff incorporates all allegations set forth in all other sections of this complaint.

67. Defendants falsified Plaintiff's time and attendance records by deleting or altering the hours worked on at least three occasions.

68. Defendants published a memorandum to employees threatening to falsify time records in the future.

69. This violates the relevant FLSA provisions and regulations.

70. Defendants' violation was willful.

71. For these reasons, Plaintiff is entitled to the remedies described below.

## COUNT 3: Banning from work in retaliation for protected activity

72. The Plaintiff incorporates all allegations set forth in all other sections of this complaint.

73. As described above, on November 11th and 13th of 2015, Plaintiff complained of actions which she believed in good faith were violation of the FLSA – and which were in fact violations of the FLSA.

74. These complaints are protected activity under Section 15(a)(3) of the FLSA.

75. On November 13, 2015, Defendants banned Plaintiff from coming to work at the Madison County Jail.

76. Defendants banned Plaintiff from work because of her protected activity.

77. By retaliating against protected activity, Defendants violated the relevant FLSA provisions and regulations.

78. Defendants' violation was willful.

79. For these reasons, Plaintiff is entitled to the remedies described below.

### COUNT 4: Retaliatory firing for protected FLSA complaints

80. The Plaintiff incorporates all allegations set forth in all other sections of this complaint.

81. As described above, on November 11th and 13th of 2015, Plaintiff complained of actions which she believed in good faith were violation of the FLSA – and which were in fact violations of the FLSA.

82. These complaints are protected activity under Section 15(a)(3) of the FLSA.

83. On November 16, 2015, Defendants fired Plaintiff.

84. Defendants fired Plaintiff because of her protected activity.

85. By retaliating against protected activity, Defendants violated the relevant FLSA provisions and regulations.

86. Defendants' violation was willful.

87. For these reasons, Plaintiff is entitled to the remedies described below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court award Plaintiff all available equitable and legal relief, including the following:

1. Declare that the conduct complained of is unlawful and enter an injunction;

2. Require Defendants to post a notice in the workplace that the policies and procedures at issue were found unlawful by this Court;

3. Require Defendants, jointly and severally, to pay Plaintiff wages owed under Sections 6 and/or 7 of the FLSA, and an equal amount in liquidated damages;

4. Require Defendants, jointly and severally, to pay Plaintiff back pay and front pay/reinstatement, as well as liquidated, compensatory, and punitive damages;

5. Award Plaintiff reasonable attorney's fees and costs of this action;

6. Award Plaintiff interest on damages at the legal rate as appropriate, including pre- and post-judgment interest; and

7. Grant any further relief that the Court deems just and proper.

The foregoing Complaint is respectfully submitted by the Plaintiff, Eboni Lyles, by and through counsel, Joel Dillard.

_____ Date: 3-1-16
Joel F. Dillard, P.A.
405 Tombigbee St.
Jackson, MS 39201
Ph: 601-487-7369
Fax: 601-487-1110
Email: joel@joeldillard.com
M.S. Bar No. 104202